**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

KAPS KAPENDE
3505 28th Parkway
Temple Hills, MD 20748

ANNIE KASEKA
924 G Street NW
Washington DC 20001

CATHOLIC CHARITIES
924 G Street NW
Washington DC 20001

Plaintiffs

v.                                             Civil Action No.

UNITED STATES DEPARTMENT OF
HOMELAND SECURITY
20 Massachusetts Avenue, NW
Washington DC 20528

Defendant

<u>COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF</u>

<u>Introduction</u>

1.  This is a Freedom of Information Act [FOIA] case.

2.  Plaintiffs are immigrants, seeking documents concerning their own asylum cases. An alien who has suffered persecution in his country may apply for asylum, under 8 U.S.C. section 1158.  If his application is denied, he may be deported: a "drastic measure," and "a particularly severe penalty."

*Sessions v. Dimaya,* 138 S. Ct. 1204, 1213 (2018) (citations and quotations omitted).

3.  Plaintiff Kapende had an interview with an asylum officer, who then wrote an "Assessment," rejecting the asylum application. A supervisor then initialed the Assessment, signifying approval. In this lawsuit, the word "Assessment" means the initialed Assessment.

4.  Kapende wants to know why the asylum office rejected his application. He fears defendant Department of Homeland Security [DHS] will use the document against him, and get him deported.

5.  The initialed Assessment is three pages long. Kapende made a FOIA request for it; DHS released the first one-third of it, but refused to release the remainder.

## Jurisdiction and Venue

6. This court has subject matter jurisdiction over this action pursuant to 5 U.S.C. § 552(a) (4) (B), and 28 U.S.C. § 1331. This court has jurisdiction to grant declaratory and further necessary or proper relief pursuant to 28 U.S.C. §§2201-2202 and Federal Rules of Civil Procedure 57 and 65.

7. Venue in this district is proper under 5 U.S.C. § 552(a) (4) (B) and 28 U.S.C. § 1391(c) because defendant is located in the District of Columbia.

## The parties

8. Plaintiff Kapende is a native and citizen of Democratic Republic of the Congo. He is an asylum applicant. He will have a hearing in the year 2019 at the Baltimore MD Immigration Court, where he will seek asylum, pursuant to 8 U.S.C. § 1158. At the immigration court hearing, the DHS may attempt to use the entire Assessment against him.

9. Plaintiff Kaseka was an asylum applicant. She was interviewed by an asylum officer who accepted her application, and then wrote an Assessment.  She wants to know what the asylum office wrote about her.

10. Founded in 1929, Plaintiff Catholic Charities is the social ministry outreach of the Archdiocese of Washington. Catholic Charities [CC] is the largest nonprofit social service provider in the DC metropolitan region. It serves more than 100,000 people each year- the poor, the homeless, immigrants, people with developmental disabilities, teen parents, and despairing families who fell into hard times.

10a. The documents requested in this lawsuit will be useful to CC in its activities:

a-1:CC has represented asylum applicants for decades, and will continue to represent them for decades to come. CC wants all its clients to see justice.

a-2.CC wants to know what asylum offices are thinking. What is important to them; what is not important; what authorities are deemed persuasive; what authorities are worthless; what leads to the granting of asylum applications; what leads to their rejection?

a-3. Armed with this knowledge, CC can give better advice to applicants. CC can help its clients see justice.

a-4. CC regularly conducts trainings and seminars for lawyers representing asylum applicants.

a-5. Lawyers at CC are members of other organizations, such as the American Immigration Lawyers Association [AILA] and the DC Bar Association, and are invited from time to time to speak at conferences on asylum.  CC lawyers write articles for ILW.com, Bender's Immigration Bulletin, and AILA; they attend public meetings at local asylum offices and at Headquarters, where they advocate for justice.

a-6. CC wants to assist other lawyers, as they seek to obtain justice for their clients.

a-7. CC wants to monitor and examine the work of asylum offices, to ensure that all asylum applicants obtain justice; are the offices doing their job properly? Are their training and internal quality control mechanisms sufficient? CC wants to assist Congress and the advocacy community in the implementation and improvement of the asylum system. CC wants to increase public awareness and to facilitate public oversight of the asylum system; CC wants to preserve the integrity of immigration court and asylum office proceedings.

a-8. CC is being forced to divert its scarce resources from other activities to counteract the harm being caused by defendant.

a-9. CC is being denied and deprived of information, resulting in harm to CC. Congress intended for organizations such as CC to get the information sought here. CC needs the information to give good advice to clients, and to provide good training to its *pro bono* lawyers who assist asylum applicants.

11.  Defendant DHS is a department of the executive branch of the United States government and is an agency within the meaning of 5 U.S.C. § 552(f).  DHS is responsible for enforcing federal immigration laws.  DHS has possession and control over the documents sought by plaintiffs.

<u>The asylum process</u>

12. An alien fleeing persecution in his native country may apply for asylum here in the United States, pursuant to § 208 of the Immigration and Nationality Act, 8 U.S.C. § 1158.

13. The alien is entitled to an interview before an asylum officer, who is employed by the DHS. At the interview, there is no court reporter and no recording device. The officer takes notes, as he asks questions.

14. After the interview, the officer writes a document.

15.That document recites facts, reasons, citations to authorities, and conclusions. It may also contain errors.

16.It is like a decision by a trial judge.  The document is given to a supervisor, who approves it, or who sends it back for a re-write. The re-written document is given to the supervisor. Eventually, the officer produces a document approved by the supervisor. The supervisor initials the document; the supervisor writes nothing himself.

17.The document written by the officer, at first, is a recommendation. After it is approved, the document is elevated: it is no longer a recommendation. It is the final decision of the agency.

18.The title of this document varies, depending on: 1] whether the applicant is in a valid immigration status; and 2] whether asylum is granted or rejected.

19. The contents of the document do not change. Only the title changes.

<u>If the asylum applicant is in valid immigration status</u>

19a. If the applicant is in valid immigration status, the document is either titled "Assessment," or it is titled "Notice of Intent to Deny."

*ASSESSMENT*

20. If the applicant is in valid immigration status, such as being a F-1 student, and the asylum office grants the application, the document written by the officer is titled "Assessment."

21. The Assessment for an applicant in valid immigration status contains facts, reasons, citations to authorities, and conclusions.

22. This document is not given to the applicant: instead, the applicant is given another document, informing him that asylum was granted.

*NOTICE OF INTENT TO DENY*

23. If the applicant is in valid immigration status, and the office decides to deny asylum, then the document is titled "Notice of Intent to Deny."

24. The Notice of Intent to Deny contains facts, reasons, citations to authorities, and conclusions.

25. This document *is* given to the applicant. As an example, a Notice of Intent to Deny is attached to this complaint as Exhibit #1.

26. The content of a Notice of Intent to Deny [NOID] is very similar to the content of an Assessment.

27. Asylum officers are instructed that assessments and NOIDs "contain the same basic components, which are:
1. Biographic/entry information
2. Basis of claim

3.  Testimony
4.  Credibility/determination."

*See* Asylum Officer training: *Decision Writing Part I,* dated June 21, 2004, at page 12.

27a. Asylum officers are given training materials that state they are to use templates when they write assessments and Notices of Intent to Deny. They are instructed that a long list of people have access to both documents. They are instructed that the components of both documents are the same. They are instructed on one page, entitled *Components of an Assessment/NOID,* that the components of both documents are identical. *See* Exhibit 1-a, attached hereto.

28.From 1998 to the present, thousands of Notice of Intent to Deny documents have been given, and still are given, to asylum applicants. In the years 2018-2021, the DHS will give over one thousand Notice of Intent to Deny documents to applicants.

29.The DHS has not suffered any harm as a result of the Notice of Intent to Deny documents being given to applicants.

30.The DHS will not suffer any harm in the future, as Notice of Intent to Deny documents are given to applicants.

<u>If the asylum applicant is NOT in valid immigration status</u>

30a. If the applicant is not in valid immigration status, the document written by the asylum officer is either titled "Assessment to Grant," or it is titled "Assessment to Refer."

*ASSESSMENT TO GRANT*

31.An applicant may have arrived in the United States as a F-1 student, studied for two semesters, but then ran out of money, and was no longer able to pay tuition. His status would terminate. He then applies for asylum. At the time of his asylum interview, he is not in valid immigration status. The officer interviews the applicant, and if he decides to grant asylum, the document he writes is titled "Assessment to Grant."

32. The Assessment to Grant, for an applicant not in valid immigration status, contains facts, reasons, citations to authority, and conclusions.

33. This document is not given to the applicant. As an example, an Assessment to Grant is attached to this complaint as Exhibit 2.

*ASSESSMENT TO REFER*

34. If the applicant is not in valid immigration status, and the officer decides to deny asylum, the document is titled "Assessment to Refer."

35. The Assessment to Refer, for an applicant not in valid immigration status, contains facts, reasons, citations to authority, and conclusions.

36. This document is not given to the applicant. As an example, an Assessment to Refer is attached to the complaint as Exhibit 3.

37. Only two people at the asylum office are involved in the Assessment: the officer and the supervisor. The Assessment is the final decision of the USCIS.

38. The asylum officer is the only person to write any words about the application. The supervisor writes no words; he only initials. The assessment was a recommendation, until it was initialed by the supervisor. At that moment, it was no longer a recommendation. The FOIA requests of plaintiffs are for the initialed assessments. The initialed assessment is not a recommendation.

39. "The Assessment is prepared by the Asylum Officer and becomes the final decision of the agency when the Assessment is approved by the Supervisory Asylum Officer." So wrote the DHS in its Reply Memorandum, ECF #32, at page 2 of 7, in *Abtew v. DHS,* Civil Action No. 13-1566.

40. "The supervisor, not the official writing the Assessment, made the final decision." *Bayala v. DHS,* 264 F. Supp. 3d 165, 173 (D.D.C. 2017)

40a. The Assessment lost its status as a recommendation when it was approved by the supervisor. After the Assessment was approved, no one else makes any further effort to study or determine anything. The decision process has ended. The USCIS has made its decision. After the supervisor

initialed and approved the document, it was not sent to anyone else inside USCIS.

40b. The initialed Assessment does not contain any discussion, or exchange of ideas. It does not contain any give-and-take. It does not state or reveal any communication between the officer and his supervisor. It does not contain a consultation; if anyone consulted with anyone inside the asylum office, that event is not reflected in the assessment.

40c. The initialed Assessment does not contain any policies.

40d. The initialed Assessment does not contain any subjective, personal thoughts. It does not contain any proposals, opinions, or recommendations. It will be used by the agency in its dealings with the public.

40e. When the DHS releases the assessment to judges, there is no confusion. There is no confusion of the public.

40f. The public is not confused when it reads assessments.

40g. The DHS uses assessments in court to deport asylum applicants. The DHS never uses Referral Notices in court.

40h. The supervisor makes the asylum officer write the Assessment the way the supervisor wants. Thus, the supervisor is the one who decides whether to grant asylum. The D.C. Circuit Court of Appeals wrote: "The Department official who wrote the Assessment to Refer then forwards it to a supervisor, who in turn decides whether to grant asylum." *Abtew v. U.S. Dep't of Homeland Security,* 808 F.3d 895, 898 (D.C. Cir. 2015).

41. Congress gave authority to "asylum officers" to consider asylum applications. 8 U.S.C. section 1158(b)(3) (C).  "Asylum officers" are given duties in 8 U.S.C. section 1225(b)(1)(B).

42. The phrase "supervisory asylum officer" does not appear in the U.S. Code.

43. 8 C.F.R. section 214. 14 (b) is titled *Approval by asylum officer.* It provides: "In any case within the jurisdiction of the RAIO…an asylum officer may grant…asylum…"

44. "The decision of an asylum officer to grant or to deny asylum…. shall be communicated in writing to the applicant." 8 C.F.R. section 208.19, first sentence.

45. "If the asylum officer does not grant asylum to an applicant…the asylum officer shall refer the application to an immigration judge…." 8 C.F.R. section 208.14(c)(1).

46. 8 C.F.R. section 208. 9 refers to "asylum officer." The officer shall conduct the interview, and consider evidence. The officer may consider "any comments submitted by the Department of State or by the Service…." Section 209(f).

47. 8 C.F.R. section 208.13 (b) instructs the "asylum officer" to make findings.

48. "Only an asylum officer, an immigration judge, or the Board of Immigration Appeals is authorized to make [certain] determinations…." 8 C.F.R. section 208.4(a)(1).

49. "Asylum officers have authority to apply section 208(a)(2)(A) of the Act…." 8 C.F.R. section 208.4(a)(6).

50. 8 C.F.R. section 208.24(a) is titled *Termination of asylum by USCIS.* It provides that "an asylum officer may terminate a grant of asylum…." Prior to termination, the alien "shall be given…the reasons therefor…" Section 208.24(c).

51. "Asylum officers" shall receive "special training in international human rights laws…The Director of International Affairs shall…. disseminate to asylum officers information concerning the persecution of persons in other countries…" 8 C.F.R. section 1208.1(b).

52. The phrase "supervisory asylum officer" does not appear in any of the above-cited provisions of the Code of Federal Regulations.

53. After supervisor approves the Assessment to Refer, the asylum officer prepares a Referral Notice, by checking boxes on a computer. The computer creates the Referral Notice, which states in general terms why asylum was denied. The DHS never introduces this Notice into evidence at immigration court, because it is useless. It states no facts, and cites no authorities.

54. Only one person at the asylum office is involved the creation of the Referral Notice: the asylum officer. The officer creates this Notice, sitting at his own desk, at his computer. No one else at USCIS is involved. The Referral Notice, created by a computer, contains boilerplate. It is not a decision. It is a piece of paper informing the applicant of a previous decision.

### Asylum applicants had some rights taken away in 1997.

55. 8 C.F.R. § 208.12(a), as of 1996, provided that officers may rely on material from outside, "credible" sources. It also contained this sentence:

> Prior to the issuance of an adverse decision made in reliance upon such material, that material must be identified and the applicant must be provided with an opportunity to inspect, explain, and rebut the material, unless the material is classified under E.O. 12356.

[*see* 62 FR 10312 (3/6/97).]

55a. § 208.12(a) was amended in 1997: it no longer contains this sentence.

55b. After 1997, and currently, an officer may rely upon material *not disclosed* to the applicant.  The applicant is no longer able to inspect, explain, or rebut that material. The applicant has no idea what sources and materials were considered by the officer.

### Asylum officers now may rely upon materials not available to the applicant

56. 8 C.F.R. section 208.12(a), [2011] entitled *Reliance on information compiled by other sources,* is just one sentence long, and states that the asylum officer may rely on material from the Department of State

"or other credible sources, such as international organizations, private voluntary agencies, news organizations, or academic institutions."

208.12 (b) provides:

Nothing in this part shall be construed to entitle the applicant to conduct discovery directed toward the records, officers, agents, or employees of the Service, the Department of Justice, or the Department of State. Persons may continue to seek documents available through a Freedom of Information Act (FOIA) request pursuant to 8 CFR part 103.

57. After the interview, the asylum officer is permitted, and encouraged, to do his own research and fact-finding.  The officer is not bound by Fed. R. Evid. 201(b) which refers to facts capable of accurate determination by resort to "sources whose accuracy cannot reasonably be questioned."  Whatever facts, theories, or inferences garnered by the officer are put into the Assessment without notice to the applicant.  The applicant is not given any opportunity to rebut such facts or inferences.

58. The asylum officer is not required to give a citation to the record in support of an asserted fact.  Local Civil Rule 7(h) is not binding on the officer.  *See* Perry *v. Shinseki*, 783 F. Supp. 2d 125, 131 (D.D.C. 2011).  He is not required to create and establish a record.

59. In the Assessment for Ms. Tjew, # 079-476-365, the officer writes "The RIC received information from ICANET [Indonesian Chinese and American Network] in an email dated March 28, 2001." *See* Exhibit 4.  The officer does not describe what the "RIC" is.  The officer does not attach a copy of the email. The officer does not state what individual wrote the email, and does not state whether the individual was trustworthy or reliable.

60. In the Assessment for Mr. Rebeiro, A # 073-163-139, the asylum officer quoted from a publication of the Department of State entitled, "Bangladesh: Profile of Asylum Claims."  This publication is NOT available to the public. *See* Exhibit 5.

61. In the Assessment dated September 30, 1999, the asylum officer quoted from this source: "DIRB, ZAR27047.FEZ, *Zaire, Information on*

*events…*3 June 1997, published on UNHCR Refworld CD-ROM." [Italics in the original].  This source is too obscure to be found.

62. In the Assessment for Mr. Tuang, # 077-870-603, the Asylum Officer made a finding "based upon guidance from Asylum Branch Headquarters, dated May 27, 1998, HQ Memo (HQASM 120/9.7.1).  This source is not available to the public. *See* Exhibit 6.

63. Catholic Charities made third party FOIA requests for the above assessments; the entire assessments were disclosed to Catholic Charities.

64. Asylum officers may rely on information from "credible sources." Which sources are credible, and which are not? Applicants would like to know, so they can cite or not cite from them. If a source is deemed not credible, an applicant may be able to convince an officer to change his mind, and accept information from it.

65. The DHS will not suffer any harm if applicants find out what sources are deemed credible by officers and what sources are not.

<u>If the asylum officer made a mistake, the applicant needs to know well in advance of his deportation hearing.</u>

66. The Assessment may contain errors made by the Officer. In that event, the applicant will be very surprised in court.  It is unfair to the applicant to be taken by surprise in court, by use of a statement written by someone else.  When a serious mistake is made by the Officer, the applicant might be able to resolve it informally or at a pre-trial conference. The Immigration Judge, no doubt, would prefer that the parties solve such a problem themselves. If not, applicant could issue a subpoena for the Officer, so the alien can cross-examine him in Immigration Court.  The Officer might admit he made a mistake; or, the Immigration Judge might conclude that the Officer made a mistake.

66a. The DHS will not suffer harm if it finds out an asylum officer made a mistake.

67. The alien needs to know several weeks before the court hearing about the need for a subpoena, in order to get it served. The Immigration Judge will want to know how long a hearing might take, and which

witnesses will testify.  Disclosure of the Assessment will benefit the Immigration Judge hearing the case, and will benefit the Immigration Court as well.

### Asylum officers have no expectation of privacy

68. Asylum officers are instructed and trained that Assessments shall later be read and used by "a number of persons," including the "applicant and his or her attorney…. [ The applicant and his attorney] "may submit a Freedom of Information Act [FOIA] request to obtain a copy of any assessment (and other information in the file)."  *See* page 11 of *Decision Writing Part I,* dated June 21, 2004.

68a. Asylum officers know that Assessments can later be made public. They do not have fear of publicity, they have knowledge of it.  Assessments might not be "front page news," but they can be quoted from in decisions published by federal courts.  Officers expect public dissemination of their remarks.

69. As of 2015, the DHS stated at its website that Assessments are available via FOIA: "The applicant and his or her attorney...may submit a Freedom of Information Act (FOIA) request to obtain a copy of an Assessment..."

www.uscis.gov/sites/default/files/USCIS/Humanitarian/Refugees66Asylum/ Asylum/AOBTCLessonPlans/ Decision-Writing-Part-1-Overview-Components-31aug10.pdf [accessed on February 7, 2015].

70. The DHS publishes an Affirmative Asylum Procedures Manual, available online. It states at page 47: "Nevertheless the Asylum Officer's Assessment may be disclosed to the applicant in response to a FOIA request..."   [accessed on May 22, 2018].

71. The Board of Immigration Appeals has recognized that evidence of what was said under oath during an asylum interview, may be considered by an immigration court. *In re R-S-J-*, 22 I&N Dec. 863, 872 (BIA 1990) ("It may be necessary to present the testimony of the asylum officer before the Immigration Court, together with notes and other evidence of what was said under oath.")

72. Assessments have often been relied upon by appellate courts. For example, see:

*Sinani v. Holder,* 418 Fed. Appx. 475, (6th Cir. 2011).
*Kudryashov v. Holder,*492 Fed. Appx.734, (9th Cir. 2012).
*Sacko v. Holder,* 510 Fed. Appx.409, (6th Cir. 2013).
*Yu v. Holder*, 693 F.3d 294, 296 (2d Cir. 2012).

72a. In *Kudryashov,* the Department of Justice mentioned the word "assessment" 12 times in its brief; the Ninth Circuit mentioned the word 11 times.

73. An Assessment may have significant repercussions for plaintiff if it is used at his immigration proceeding.  An Assessment has a potential significant impact on plaintiff's immigration status.

74. The Court can take judicial notice that busy asylum officers will, from time to time, make mistakes.  The Eleventh Circuit noted an error in an Assessment in *Ido v. U.S. Att'y Gen.,* 480 Fed. Appx. 972, (11th Cir. 2012) (the year of the first arrest was written down in error).

75. The Ninth Circuit criticized reliance upon an Assessment in *Singh v. Gonzales*, 403 F.3d 1081, 1087 (9th Cir. 2005), deeming it "potentially unreliable." The Court attached a copy of the Assessment as an Appendix to its decision. [It is also attached to this complaint as Exhibit 7.]

<u>The DHS disclosed entire Assessments from 1998 to 2005 to FOIA requesters</u>

76. From 1998 to 2005, if the applicant made a FOIA request for the document, the DHS furnished it to him. During the years 1998 to 2005, more than one hundred Assessments were disclosed to FOIA requesters. During this time period, the DHS suffered no harm.  In 2005, the DHS changed its position, and no longer furnished Assessments.

77. During this same time period, plaintiff Catholic Charities made third party FOIA requests for dozens of Assessments of other asylum applicants. Each of those requests was granted.

78. During this same time period, the DHS conducted no studies concerning any harm that may have resulted from the above disclosures.

<u>In 2006, the DHS stopped disclosing entire Assessments to FOIA requesters, but continued to give entire assessments to judges, so that asylum applicants would be deported.</u>

79. Beginning the year 2006, and continuing to the present, the DHS has refused to give entire Assessments to FOIA requesters.

80. From the year 2006 to the present, the DHS has often given entire Assessments to immigration judges and appellate courts.

81. The DHS believes it is fair to surprise an asylum applicant in court by using the entire Assessment against him. The DHS often tells judges that Assessments are reliable and probative documents, that reveal truth. The DHS is not embarrassed by the fact that it refuses to disclose Assessments to FOIA requesters before trial, but it springs Assessments upon applicants in the middle of immigration proceedings.

82. The DHS does not allow itself to be ambushed in court by previously undisclosed documents. If a litigant attempted to surprise the DHS in court, the DHS would object.

83. The DHS does not suffer any harm when Assessments are disclosed to judges. Applicants at times suffer great harm: they get deported.

84. The DHS offered an Assessment into evidence at the conclusion of the applicant's case in Abdramane v. Holder, 569 Fed. Appx. 430, 434 (6th Cir. 2014). Counsel for applicant objected, but the Immigration Judge admitted it anyway.

85. In Li v. Holder, 745 F.3d 336 (8th Cir. 2014), the applicant was interviewed by asylum officer Laurie Kuriakose. The Court mentioned "Kuriakose" 19 times in its opinion.

86. There is no discovery in immigration court.

87. The Third Circuit criticized the DHS for delaying cases, in Totimeh v. Att'y Gen., 666 F.3d 109, 112, note 3 (3d Cir. 2012). In that case, which did not involve an Assessment, the DHS refused to furnish documents, and insisted that Totimeh file a FOIA to get them. After a long delay, Totimeh

obtained the documents, but the Third Circuit stated "It is strange that the Government did not provide this information to Totimeh or the IJ at the time the former asserted his correct admission date, and instead forced him to seek out the documents through a FOIA request. This resulted in unnecessary delay, an additional written decision by the BIA, and an additional appeal to us. We expect that the Government will respond (and quickly) in the future with such information in similar circumstances."

88. From 2006 to the present, the DHS has not suffered any harm resulting from its disclosure of Assessments to judges.

89. From 2006 to the present, the DHS has not conducted any studies concerning harm that may result from disclosure of Assessments to judges.

90. From 2006 to the present, the DHS has instructed asylum officers that the applicant may later read his entire Assessment.  During this time period, asylum officers had no expectation of privacy, concerning Assessments.

91. From 2006 to the present, DHS has disclosed thousands of NOIDS to asylum applicants. This disclosure did not, and does not, harm DHS.

Training of FOIA processors

92. Defendant gives, and has given, written instructions to its FOIA processors, for the past ten years. These instructions include the page mentioned in paragraphs 92a-92e:

92a. The December 2015 "FOIA Processing Guide" states at page 159 that, concerning asylum officer assessments, the processor should "Withhold in full."  This guide is 262 pages long.

92b. In 2016, defendant released 4,321 pages to Professor Jacqueline Stevens in response to her FOIA request for "materials used for guidance in managing USCIS FOIA requests."  In these pages, at five different places, the processor is instructed to "withhold in full" asylum officer assessments.

92c. In June 2017, defendant released 1,239 pages to Catholic Charities in response to its FOIA request concerning "administrative appeals

of FOIA requests." In these pages, at five different places, the processor is instructed to "withhold in full" asylum officer assessments.

92d. The pages referred to above [262, 4,321, and 1,239] total 5,822 pages. These pages represent all of the written instructions given to FOIA processors, as of May 2018, concerning assessments.

92e. The 5,822 pages referenced above are faulty, incomplete, and not in accordance with the law.

## Procedural history

93. Plaintiff Kapende was born in Democratic Republic of the Congo and arrived in the United States.  He applied for asylum and interviewed at the Arlington Asylum Office.  The asylum officer wrote an Assessment, gave it to his supervisor, who approved it.  The initialed, approved Assessment is no longer a recommendation. Plaintiff seeks this document.

93a. The Assessment was delivered to a DHS lawyer, who has it in his file. He may use it to ambush Kapende in immigration court.

94.  Kapende does not know how accurate the Assessment is.  He does not know if he should subpoena the asylum officer to court. He does not know what sources were cited in the document.

95.  Catholic Charities made a third party FOIA request, on behalf of Kapende, for the Assessment; DHS responded; Catholic Charities made an administrative appeal; DHS released only part of the Assessment. *See* Exhibit #8.

96.  Kapende has exhausted his administrative remedies.

97.  Plaintiff Kaseka was born in the Democratic Republic of Conge, and came to the United States. She applied for asylum, using her full name: Annie Regina Kaseka Kaleka. She was interviewed by an asylum officer, who granted her asylum. The officer wrote an Assessment, gave it to his supervisor, who then approved it. This approved, initialed document is no longer a recommendation. This is what Kaseka seeks.

98.  Catholic Charities made a third party FOIA request, on behalf of Kaseka, for the Assessment; DHS responded; Catholic Charities made an administrative appeal; DHS released part of the Assessment. *See* Exhibit #9.

99. Kaseka has exhausted her administrative remedies.

100. Catholic Charities has made many third party FOIA requests for Assessments on behalf of asylum applicants in the past.

101.  Catholic Charities has many such requests currently pending before DHS.  For example, Mr. Qaraghuli, NRC 2018-001-224, has been waiting since January 3, 2018.  Mr. Kidane, NRC 2018-072-012, has been waiting since May 16, 2018.

102. Catholic Charities will make many more such requests in the coming decades.

<u>Exhaustion of administrative remedies</u>

103. All the plaintiffs have exhausted any and all administrative remedies with defendant.

<u>FIRST CAUSE OF ACTION</u>

104. Plaintiffs restate, repeat, re-allege and incorporate the allegations of paragraphs 1-103 as if fully set forth herein.

105.   Kapende and Catholic Charities have the legal right under FOIA to obtain the entire Assessment of the asylum officer, and no legal basis exists for defendant's failure to make the document available.

106.  Defendant has violated the FOIA, 5 U.S.C. §§ 552(a). Defendant's wrongful withholding of the agency record violates the FOIA, § 552(a) (3) (A).

<u>SECOND CAUSE OF ACTION</u>

107. Plaintiffs repeat, re-allege and incorporate the allegations of paragraphs 1-106 as if fully set forth herein.

108.   Kaseka and Catholic Charities have the legal right under FOIA to obtain the entire Assessment of the asylum officer, and no legal basis exists for defendant's failure to make the document available.

109.  Defendant has violated the FOIA, 5 U.S.C. §§ 552(a). Defendant's wrongful withholding of the agency record violates the FOIA, § 552(a) (3) (A).


<u>THIRD CAUSE OF ACTION</u>

110. Plaintiffs repeat, re-allege and incorporate the allegations of paragraphs 1-109 as if fully set forth herein.

111.  Catholic Charities has made many third party FOIA requests for Assessments on behalf of asylum applicants in the past.

112. Catholic Charities has many such requests currently pending before DHS.

113. Catholic Charities will make many more such requests in the coming decades.

114. The above failures of DHS to obey FOIA caused damage to Catholic Charities. This plaintiff is hampered in its activities and goals. This plaintiff is being forced to divert resources from other programs to prosecute this lawsuit. This plaintiff will suffer harm in the future, until DHS changes its policies.

WHEREFORE, plaintiffs request that judgment be entered in their favor against defendant and that the court:

a)  Order defendant to disclose the entire Assessment to plaintiff Kapende and plaintiff Kaseka forthwith;
b)  Declare that defendant's failure to disclose the entire document violates FOIA:
c)  Enjoin defendant from failing to disclose entire Assessments in the future;
d) Order defendant to re-write its instructions to its FOIA processors;

e) Award plaintiffs reasonable attorney fees and costs pursuant to
5 U.S.C. §552(a) (4) (E); and
f) Grant all other such relief to plaintiffs as the Court deems proper and
equitable.

Respectfully submitted,

Attorney for Plaintiffs


David L. Cleveland
DC Bar # 424209
Catholic Charities of Washington
924 G Street, NW #125
Washington, DC 20001
[202] 772-4345 Fax: [202] 386-7032
1949.david@gmail.com